### A. VARICK AND J. B. VARICK v. EDWARDS AND OTHERS.

MEDCEF EDEN, the elder, was in possession of certain premises at the time of his death, in the year 1798, and by his last will devised the said premises to his son Joseph, and certain other premises to his son Medcef, and added the following clause, "It is " my will, and I do so order and appoint, that if either of my " said sons should depart this life without lawful issue, his share " or part shall go to the survivor." In the year 1767, one Bridgwater was the owner of the premises devised to Joseph, and executed a mortgage of the same, to one Howard. Bridgwater left the country on the evacuation by the British. On the 25th December, 1783, Howard assigned the mortgage to Medcef Eden, for the consideration of £137. On the 21st of April, 1782, a bond had been given by Bridgwater to Eden, on which was endorsed that the deeds had been delivered for security of the same, to be returned when the monies were paid, or a mortgage to be entered. This endorsement was not proven to be in the hand writing of Bridgwater, but the testimony led to the conclusion of its being genuine. In the month of September, 1804, Joseph Eden and Medcef Eden, as executors of their father, assigned the mortgage, executed by Bridgwater, to *Joseph Winter*, transferring the aforesaid mortgage and the bond therein mentioned, and all monies due and to grow due thereon. The instrument also contained the following clause—"And we, the " said Martha Eden, Joseph Eden, and Medcef Eden, do hereby, " for ourselves and our heirs, release and convey unto the said " Joseph Winter, his heirs and assigns, all our right, title and "interest in and to the said lot of ground and premises before men- " tioned, and every part and parcel thereof."

*Held,* upon the evidence, that the elder Eden went into possession of the premises as equitable mortgagee, and as assignee of the Howard mortgage; and twenty years not having elapsed, occupied them, as mortgagee, at his death. That there was no suffi-

cient evidence of a claim by Eden, as owner, distinct from his character of mortgagee. That his will operated only on the right in him, viz. a right to the mortgage money and securities, coupled with a possession as mortgagee; and that the absolute right to the fee accrued to Joseph in 1802 or 1803, not through his father who had no such right, although it arose from the gift of the father.

Held hence, that if the question was open, the Edens should be regarded as having, even at law, no right but what grew out of the bond and mortgage, and passed with the transfer of these. But that the decision of the court of errors has settled that there was a further independent interest, and that a fee which, however, being but a possibility in Medcef, could not pass under any transfer, so as to be effectual in a court of law, although it afterwards vested in him.

Held that, considering the case as if such a bill as the present had been filed in the year 1814, after Joseph's death, the law of the case, as pronounced by the court of errors, must be taken as then prevailing, and the question then was, whether such a transfer, invalid in a court of law, could be sustained in equity?

Examination of the doctrine of the court in aiding defective conveyances, execution of powers, and carrying into effect instruments according to the intent, which cannot be supported at law. Review of cases.

The rule is, that where there is ground to infer an intention to convey an estate or interest upon a valuable or meritorious consideration, and the legal estate does not pass, this court will interpose. Neither covenant nor express contract is necessary.

Held, upon the authorities, that the sale of the expectation of an heir is not void in this court, but if made bona fide, and for a fair consideration, will be supported.

Held that, in this court Medcef's interest passed by his assignment if there was an intention to pass it, if the consideration was valuable and fair, and no fraud existed in the case, and held upon the evidence that it could be sustained on these several grounds,

Held, that the complainants were not precluded by the judgment at law from raising the question in this court. That a decision which goes upon the ground of the want of jurisdiction in a court of law, or where the matter is of exclusive equitable cognizance, is not a bar. The cases examined.

Held also, that the lapse of time before filing the bill, formed no objection. The statute could not run while the parties claiming, under the instrument, were in possession, which was from 1813, the death of Joseph, until 1829.

THE bill in this cause was filed for the purpose of compelling the execution of a conveyance by the defendants, claiming under the will of Medcef Eden the younger to the complainants, claiming under an assignment or transfer of a certain bond and mortgage, executed · by Medcef and Joseph Eden, his brother, to one Joseph Winter. The history of the causes relating to the property in question, and most of the facts in the present case, are to be found in the reports in *Varick* v. *Jackson*, (2 *Wendell*, 200,) *Pelletrau* v. *Jackson*, (11 *Wendell*, 110,) and *Jackson* v. *Waldron*, (13 *Wendell*, 178.) Some other evidence was produced in the present case, and a part of it is important. It is noticed in the opinion.

*Mr. William Kent* and *Mr. Wood*, for complainants,

*Mr. Foot* and *Mr. G. Griffin*, for defendants.

March 30. 31.
May 4th.

THE ASSISTANT VICE-CHANCELLOR :—I approach with anxiety and self-distrust the discussion of this important case ; a case which has given birth to such severe litigation ; and which, while it has tasked the powers of the ablest of the profession and of the bench, has been marked with the most strikingly inconsistent decisions of eminent tribunals, and stands an unpleasing memorial of judicial fallibility. In examining it I shall first inquire whether under any circumstances and at any time, such a bill as the present could have been filed by any one standing in the same situation as the complainants ; and *next*, if it could, whether any circumstances now exist which prevent the exercise of such a right.

I. To present the first point more distinctly, I shall suppose the case of a bill filed in the year 1814, when Medcef Eden the younger had been a few months deceased.

A summary of the facts is essential. And from all the testimony, I hold it indisputable that Medcef Eden the elder, was in possession at his death as mortgagee only. It will be noticed that the Chancellor, in *Jackson* v. *Waldron*, (13 *Wendell*,) considered the weight of evidence

to have been in favor of this supposition. Senator Tracy holds that, even if the possession did not commence before the purchase of the Howard mortgage, yet Eden's claim of ownership between that event and his death, with his devising the same as if he held the fee, was a sufficient proof of a higher title than mortgagee. But he says, "that though the release purported to carry a fee interest, "it would not conclude the party from showing that the "mortgage was outstanding. A distinct avowal of Eden "that he held possession as mortgagee, and one from "Bridgwater, that the mortgage was due and unpaid "would be sufficient. That there was nothing in the in- "strument concluding either party from proving any fact "illustrating the true condition of the mortgage, or the "actual character of the estate."

Other testimony has been adduced to this point besides that used on the trial at law, and the whole carefully examined, leaves no room to question that the elder Eden commenced his possession as equitable mortgagee only.

The earliest document is the bond executed by Bridg- water to Eden, the 21st of April, 1782, with the endorse- ment, "that the deeds had been delivered for security of "the same to be returned when the monies were paid," or (which is the meaning,) "a mortgage to be executed."

This bond is fully proven. The denial by Pelletrau of his signature as a witness, I am constrained to say was untrue. The bond is established beyond contradiction or evasion.

But the endorsement is not established in evidence. The hand writing of Bridgwater is not proven. This is a defect; but I am satisfied from other circumstances and evidence, that this endorsement discloses the truth of the case. *Bayard* swears that he knew Bridgwater, who resided on the premises, and that he was at his house before the evacuation; he went to see Ware Branson who introduced him to Bridgwater. *Tylee* says he knew Bridgwater and wife; that they lived on the premises before the war; that he was the reputed owner, and that he continued there until he went off with the British.

1840.

Varick
*v.*
Edwards and
others

*Wood* says that he had been in Bridgwater's house in Nassau-street.

On the other side is, first, the testimony of *Quackenboss*, who says that Eden asserted that he had bought the property, and afterwards discovered there was a mortgage which he had to pay, and which cost him £200. It is impossible to believe that this was the fact. The coloring is, that the mortgage unexpectedly appeared. Now the mortgage was registered on the day after it was executed, viz: the 1st of August, 1768, and to suppose, that if Eden had fairly purchased the property he was ignorant of that mortgage, is out of the question ; and yet the title deeds which the complainants have produced, must, I think, have been in his possession. Now all this is consistent with the endorsement and with nothing else.

There is also the evidence of Pelletrau. He says, "that "he went to school to one Piggott, who kept there before "the British evacuated and who held under Eden ; that he "saw Piggott pay rent to Eden when he went to school, "which was in 1782 or 1783." At that time the witness was ten or eleven years of age, and yet speaks with confidence of this payment of money as a payment of rent to Eden. But if his statement is perfectly true, it is easily explained. The testimony · of Bayard and Tylee bring Bridgwater's possession down to the eve of the evacuation. It may very well be that if a small portion of the premises was used as a school, Eden was allowed to receive the rent after the bond executed to him in 1782. Wood says there were buildings extending a considerable way in the rear. This view dispenses with the necessity of commenting upon the shock which Pelletrau's testimony has received, by the evidence of Wood and others of the genuineness of his signature to the bond of April, 1782.

Again, Wood very explicitly deposes that the elder Eden, as well as his sons, admitted that the title originated in a mortgage from Bridgwater, and fixes the date of one of such admissions in 1783, when Bridgwater was present, before the evacuation. I consider that this declaration of

the elder Eden is as admissible as the declarations that he had bought that property, or that he was the owner. If the latter statement from his own mouth is to serve to characterize his claim, as Senator Tracy has allowed it to do, the other declaration must be allowed to contradict or neutralize it. Probably both declarations are legal evidence, (2 *Philips by Cowen*, 192 *n.*) Certainly that to Wood is such. (*Barker* v. *Roe*, 2 *Russel*, 67, *n.*)

Again, in April, 1782, Bridgwater executes his bond to Eden. In November, 1783, the evacuation takes place, and Bridgwater leaves the city. On the 27th of December, 1783, the assignment of the Howard mortgage is taken by Eden. As owner he would naturally have had it satisfied of record. As second mortgagee he would protect himself by taking an assignment.

Again, the interest on the mortgage had been paid down to August, 1778, and there were six endorsements on the bond to that effect signed by Bridgwater, the last in July, 1778. The consideration of the assignment was plainly the principal and interest then due, viz. £137 9s. 8d. And I may here notice a fact of some little consequence in which the testimony before me presents a different case from that at law. The chief justice, after observing that in point of fact the mortgage was considered by all parties as of little value at the time of the assignment, says, that there was then due upon it about $900, while it was assigned for $500. This is certainly stated on the supposition that no interest had ever been paid on the mortgage ; but in fact the interest had been paid down to 1778, and the actual amount due in 1804, was about $700.

The facts then that there was only five years' interest due when the elder Eden took the assignment; that he gave the precise amount due upon the bond ; that he had at that time no right in the property except such as he obtained as equitable mortgagee by deposit of the deeds, and had no possession except for the few months which elapsed since Bridgwater left the city, fixes the result clearly upon my mind that he took the mortgage as a subsisting valid security ; and that alone, or that in con-

junction with the equitable mortgage, was the foundation of his claim.

Having then reached this conclusion, not as the most plausible inference from dubious circumstances, but as an unquestionable fact in the cause, the rights of Eden are ascertained, and his acts of ownership are all consistent with those rights. His renting of the premises, his vague assertions of ownership, and even his will, are consistent with the fact of the inception of his title being as mortgagee, and his actual title being nothing else. Such it remained at the time of his death in 1798. It had not ripened into an absolute fee by twenty years' possession. It is beyond a question that any one entitled to redeem could then have redeemed as well the equitable mortgage to himself, as the Howard mortgage, and regained possession.

But here arises a difficulty in the case. In the opinion of Senator Tracy it is distinctly affirmed, " that it is no " matter if it was in the character of a mortgagee that his " possession commenced, when he instantly disclaimed it, · " and held himself out to the world as absolute owner. " To this point the proof is all one way, and the conclu- " sion cannot be escaped that he claimed some other and " greater estate in the premises than that of assignee of " the mortgage." I cannot avoid coming upon the evidence before me to a different conclusion, even upon the fact of claim ; and I consider that there is no satisfactory evidence of any assertion by Eden of a distinct title. That contained in the will, which is all that deserves regard, is equivocal. And it strikes me as singular, that when the origin of the right and possession is clearly traced, the vague assertions of the party shall enlarge his restricted right into an unrestricted estate. Every act he has done, it may again be remarked, is entirely consistent with the true character of his claim. His assertions of ownership in his will is the only unrefuted evidence of ownership. It is too much to convert that assertion into a right.

But it must be borne in mind that I am examining the case upon the supposition of such a bill as the present

1840.

Varick
v.
Edwards and
others.

being filed in the year 1814, after Joseph's death. The question whether I have a right in this suit to deduce any other conclusion from the evidence than that which was drawn by the court of errors, (taking the senator's opinion entirely as its conclusion,) must depend upon a question to be discussed under another branch of this cause, viz. whether, supposing such a bill could have been then filed, it is not now barred. The effect of the decision will then appropriately arise.

If the elder Eden began his possession in 1782, or at the date of the evacuation in 1783, as mortgagee by the deposit of the deeds—and no acts subsequently, and no assertions of his own could convert him into absolute owner, he then died in 1798 as mortgagee in possession, and nothing more. His title had not yet ripened by the lapse of twenty years into a fee. What then did his will operate upon? Upon that which he had; not upon that which he had not. Upon his right as mortgagee coupled with the possession, his right to the mortgage money if any remained due. This passed from Eden by his will, and nothing else could pass, or be affected by it. And this right vested in possession in Joseph; and had the given events occurred before twenty years elapsed, would have vested in Medcef. But during the life and possession of Joseph, a new right upon the lapse of twenty full years grew up, and attached to the possession, and vested in the possessor of the land. It accrued to such possessor indeed in consequence of the mortgage interest devised by his father; but it did not come from his father. Thus Joseph took possession in 1798, as mortgagee and mortgagee only, and his title and right was nothing more until either 1802 or 1803. Then the twenty years had elapsed, and presumptively an absolute fee was acquired. But Joseph was the acquirer of that right, and held it for his own use, and that of his heirs; and it would go to Medcef upon the happening of the events provided for by the will. Or rather, it is more precise to say, that the father bequeathed a right to a mortgage which involved a right to the possession, and the law attached to this right at a sub-

sequent time, the right to the fee. The interests therefore were separable and distinct. The right which came from the father was one, that derived from the law was another. But this latter right was attached to the mortgage—vested in the holder of the mortgage—arose only because of the mortgage—and followed the fate of the mortgage. Whoever held that took the right as its inseparable appurtenance. I do not mean to say, but that for many purposes, the possession alone would have been a defence to a claim. But suppose, for example, an ejectment against the claimants under Eden in the year 1808, and possession had been proven, and such testimony as to Eden's claim of ownership had been given as has been produced in this case. Suppose that this had been repelled by the acknowledgments proven by Wood, showing the character of the holding. Beyond a doubt the party would have been driven to prove the mortgage; to show its date; produce the bond with no endorsement on it since 1778; and drive the other party to prove payments or admissions within twenty years. The title then rested conclusively upon the mortgage—derived its birth, its growth, and its maturity from it—and we must remember that this rule as to the mortgagee getting the fee after twenty years' uninterrupted possession does not proceed upon the presumption of an absolute conveyance, but is merely a positive rule introduced for the purpose of quieting the title after so long a neglect to redeem. (Per *Eyre,* Ch. Baron, 1 *Anst.* 142.)

What then passed by the assignment of the mortgage in September, 1804 ? All the right of Joseph and Medcef to the mortgage as executors. All the right in the debt held by either of them individually. All the right which Joseph held in the premises as mortgagee in actual possession. Restrain the terms in the last clause of the instrument within the narrowest limits, and it is impossible not to hold that they carried the right to the possession which Joseph at that time held. And were the matter not prejudged, I should conclude that this was equally effectual at law, to transfer Medcef's future and contingent rights;

that it was the transfer of such a right in a chattel real, to which was attached the right of possession, and to which possession the fee had become united and knit by the operation of time.

But the point *is* prejudged, and the decision is, that the Edens had a right other than that which grew out of the mortgage and depended upon and subsisted through it; that such right was a fee, and that Medcef's interest in it could not be transferred by assignment, so as to vest the title subsequently acquired by him, as a legal estate, and to bar his recovery at law. I consider the decision in the court of errors as substantially this: That Medcef Eden could transfer to Winter any right in the mortgage as executor, or to the debt individually, or any actually vested estate or interest; but he could not transfer a title available in a court of law, to the estate in fee, which, upon the expressed contingencies happening, would vest in him. That it is immaterial whether the elder Eden had at the date of his will a fee simple absolute, or it had been since acquired. It was still to go under the limitations of the will; and Medcef's interest was a naked possibility without an interest, and could not be the subject of a valid transfer at law.

This being the decision, it is obvious that the complainants are remediless at law. No new matter can vary the ground of this judgment, for the fact is not to be gainsayed that the fee was acquired by the lapse of twenty years' possession after Eden's death, and the decision settles the question even on the supposition of this being the fact. Now the law as to the actual rights of the parties was the same in 1814, after Joseph died, as in 1834, when the court of errors decided. Then, in 1814, it was the settled law that the interest in fee in this property which Medcef got upon the death of Joseph, could not be considered in a court of common law as parted with by the assignment of September, 1804; because it was such a naked possibility as such a court could not recognize as transferable.

1840.

Varick
v.
Edwards and
others.

We thus reach the question, whether the right passed, or could have been enforced in equity.

A well settled branch of equity jurisdiction consists in the carrying instruments into operation according to their true intent, which cannot take effect at law by reason of some legal defect. Thus, powers to charge an estate, or other powers, which are not executed in the form prescribed, or for any other reason are ineffectually executed, are enforced in this court in favor of certain classes of persons, and under certain circumstances. The court does not, any more than a court of law, hold the power well executed, unless the form is pursued ; but where the execution is for a meritorious consideration, it compels the person seised of the estate in default of the execution of the power, to make good the defect. (*Sugden on Powers*, 97. *Sinclair* v. *Jackson*, 8 *Cowen*, 588. *Barr* v. *Jackson*, 3 *Hammond*, 529.) The extent of this rule will be appreciated when it is considered as affecting the estate of a third person to whom, in default of execution, the property is given over. If the grantor of an estate limits it for a certain period, or until a certain event, and then to go in such manner as he shall appoint under a power reserved to be executed by himself in a particular manner, his power defectively executed in favor of a purchaser or creditor should be made good upon every principle of justice. But if he has given the estate over to another in case he does not exercise the power, the other has far stronger ground for insisting that he had a vested right, only to be divested by adhering to the mode prescribed. Yet against him the defect will be remedied. (*Holmes* v. *Coghill*, 7 *Vesey*, 506. *Ellis* v. *Nimmo*, 1 *Lloyd & Goold*, 333.)

Another example of the exercise of this jurisdiction is the supplying a defect in the surrender of a copyhold. (*Mr. Cox's note to Watts* v. *Bullas*, 1 *P. Wms.* 60. *Hardham* v. *Roberts*, 1 *Vernon*, 132. *Jennings* v. *Moore*, 2 *Vernon*, 609. *Bradock* v. *Mattock*, 6 *Mad. Rep.* 361.) In *Ellis* v. *Nimmo*, before cited, the Lord Chancellor observes, that Lord Alvanley had stated he thought the execution of a power and a surrender of a copyhold went hand in hand,

precisely on the same ground. He himself says, "defec-
"tive execution of powers and defective surrender of copy-
"holds depend upon the same rules. Now in these cases
"the court executes the intention of the settlor either against
"his representatives, or the person taking the estate in de-
"fault of a valid execution of the power or surrender of
"the copyhold, where there is a good consideration."

In *Fothergill* v. *Fothergill*, (*Freeman's Rep.* 256,) it
was held by the Lord Keeper and Master of the Rolls, "that
"whenever a conveyance is made upon a good considera-
"tion, if there be any defect in the execution of it, this
"court has always supplied the defect; as in the case of
"feoffments, to supply the defect of livery; in devises of
"a copyhold, to supply the defect of surrender; and much
"more in case of a power."

And the origin and extent of the doctrine as to powers
is fully stated in the great case of *Coventry* v. *Coventry*,
before Lord Macclesfield, assisted by the Master of the
Rolls, and Barons Price and Gilbert. See the report in
*Francis' Maxims in Equity, Appendix. S. C. Gilbert's
Rep.* 100, 2 *P. Wms.* 222.

It may be proper to notice a distinction as to the powers
which are in their nature legal, and as to which equity
cannot interpose. The difference is, when a power arises
from an act of parliament, and when from the act of the
party. The anonymous case in *Freeman's Reports*,
(page 224,) and the observations of Baron Gilbert in Cov-
entry's case, as to a power to appoint lands by instrument
signed and sealed before, and one after the statute of frauds,
clearly illustrate this difference.

What then is the foundation of this doctrine? A reason-
able ground to infer an intention to convey an estate or
interest, in consequence of the reception of a valuable con-
sideration, or the inducement of a meritorious one. In
the language of Baron Price, (*Coventry* v. *Coventry*,) "If
"the legal estate should not be conveyed in virtue of the
"power, there is the same foundation for considering her
"a *cestui que trust*, as the other a trustee." In the words
of Lord Redesdale, (cited *Blake* v. *Marnell*, 2 *Ball &*

1840.

Varick
*v.*
Edwards and
others.

1840.

Varick
v.
Edwards and
others.

*Beatty*, 44,) " where a person contracts for valuable con-
" sideration, he is understood in equity to engage with the
" person with whom he is dealing, to make the instrument
" as effectual as he has power to make it, and whenever
" that is the case, I do not see any thing in any of the au-
" thorities to raise a doubt that it shall have effect, so far
" as the person executing has power to give it effect."

Thus, therefore, when the circumstances of intention
and good consideration occur, and the legal title has not
passed at law, this court will interpose.    As Baron Gilbert
observes :  " As to the other set of cases, showing that this
" is not a *legal lien* upon the estate, I cannot see what
" weight that can have in a court of equity ; since this is
" the very reason that obliges the parties to come here for
" relief."

We should notice, that it is not necessary there should
be a covenant or an express contract.    It is binding upon
the conscience to do what was meant to be done.    " The
" aiding an imperfect conveyance, and the carrying into
" execution a covenant to convey, stand upon the same
" footing in all respects. If tenant in fee makes an im-
" perfect conveyance for a valuable consideration, this court
" will supply the defect, and decree an effectual convey-
" ance to be made."    (Master of the Rolls in *Coventry* v.
*Coventry*.)

The recurrence to the principles of the court upon
these points will lead to a more full comprehension of the
authorities relied upon for the purpose of showing that it
will interpose in the precise case now presented.

And first as to the decisions relating to terms for years.

The case of *Theobold* v. *Duffy*, (9 *Mod.*, 101,) is a
leading decision.    An estate for life in a term of 500 years
was limited to A., and the residue thereof to a feme sole.
The husband and, wife sold the remainder of the term for
a valuable consideration to *J. S.*    The life-tenant dying,
the husband and wife sold the term to *J. N.* who recovered
it at common law, because the first sale was void.    The
bill was for an injunction, and a perpetual one was de-
creed, the first vendee to have the term.    The technical

reasoning by which it was held void at law was this.
That an estate for life being greater than an estate for
years, be it ever so long, when a lessee for years grants it
for life, he has granted all his estate, and there can be no
limitation over. It was not therefore an estate, but the
bare possibility which was given to the grantee of the residue; and as a possibility, it was not assignable at law. But
inasmuch as it was assigned for valuable consideration, to
impeach it after it vested in possession, was against
good conscience, and furnished a case for the interposition
of this court.

This case was decided by Lord Macclesfield, affirmed by
Lord King, and afterwards by the House of Lords. This
is stated in the *Duke of Chandos* v. *Talbot*, 2 *P. Wms.*
608. And in that case, after stating the rule, it is said :
" But were it not in strictness to operate by way of assign-
" ment, yet it would be good as an agreement, especially
" when made for a valuable consideration."

It is needless to do more than cite the other cases confirming this doctrine. ( *Warmstrey* v. *Tanfield*, 1 *Rep. in
Ch.* 29. *Wind* v . *Jekyl*, 1 *P. Wms.* 572. *Goring* v.
*Bickerstaff*, 1 *Ch. Cas.* 8. *Pollexfen*, 31.)

The decisions relative to an assignment of the expectation of an inheritance deserve a careful examination.
Such an assignment is clearly void at law. ( *Touchstone*,
239, *Jones* v. *Roe*, 3 *T. R.*, 88.) Yet in several cases equity
has carried such a disposition into effect ; and where the
subject of the agreement was an inheritance in real estate
as well as personal.

The case of *Beckley* v. *Newland*, 2 *P. Wms.* 182,
settled that an agreement between two presumptive heirs
to divide equally what should be left to them, will be supported. This decision has, I believe, never been questioned.
( *Hyde* v. *White*, 5 *Simons*, 524.) In *Hobson* v. *Trevor*, (2
*P. Wms.* 192,) a father agreed, upon the marriage of his
child, that he would convey to the husband one third part
of all such real estate as should descend or come to him
from his father, then living, and gave bond to that effect.
The execution of the agreement was decreed.

It is to be observed, that Lord Hardwicke relies much on these cases in *Wright* v. *Wright*, and that Mr. Fonblanque treats them as law. Mr. Maddocks however states, that in the case of *Harwood* v. *Tooke*, (*MSS.* 1804,) Lord Eldon expressed serious doubts as to these decisions. (1 *Mad. P. & Pr.*, 349, *n.* d.) That case will be afterwards noticed. In *Carleton* v *Leighton*, (3 *Merivale*, 670, 1805,) Lord Eldon thus expresses himself: " The expectancy of " an heir presumptive, or apparent, (the fee simple being " in the ancestor,) was not an interest or possibility, nor " was capable of being made the subject of assignment or " contract; that the cases cited," (those from Peere Williams,) " were cases of covenant to settle or assign property " which should fall to the covenantor; where the interest " which passed by the covenant was not an interest in the " land, but a right under the contract; therefore that no " interest in the estates in question passed under the bargain " and sale of the commissioners." The case arose upon a bill claiming certain estates as heir at law, and a plea of bankruptcy of the complainant, and an assignment made prior to the estate descending.

The reporter must be inaccurate in making Lord Eldon say that the possibility could not be the subject of contract. It is plainly inconsistent with his subsequent observations.

Again, in *Morse* v. *Faulkner*, (3 *Swanston*, 429, *n.*) there were three nephews of a party who was seized of a copyhold and who died intestate. The eldest had been long absent and was supposed dead at the death of the uncle. The second nephew died leaving a son, and the third entered into possession. The son of the second claiming the property was admitted by his uncle, and proceeded to sell the same, and surrendered to the purchaser. It afterwards appeared that at that time the eldest nephew was alive, so that no estate was in the seller. That nephew died, however, and left the seller his heir at law. An action of ejectment was sustained against the purchaser's heirs by the heirs at law of the vendor. (See 3 *T. R.* 365,)

and then a bill was filed by the former for a surrender—to quiet the possession—and an injunction.

1840.

Varick
v.
Edwards and
others.

The Chief Baron said : " It is true that when a man " not having a title at the time agrees to sell, and after- " wards such title accrues to him, the court binds the con- " science of the vendor himself, and compels him to make " good the title at any future period when he can. It did " not follow, however, that relief could be had against the " heirs. The land was not bound, nor the conscience of " the present defendants by the act of the surrenderer. " But really I do not think it necessary to go into the " general question upon this occasion. This is not the " sort of sale that it becomes this court to take notice of. " A common soldier goes down to a country ale-house, " and late at night calls together two or three people and " offers to sell his estate. Two bid for it and then the " affair is all over."

In *Jickling's Analogy*, (p. 279,) it is stated that the opinion in this cause, (that is as to the general question,) was in direct opposition to the opinion of Mr. Sergeant Hill, and perhaps cannot be supported. See also *Watkins on Conveyancing*, p. 131. Mr. Atherley, (*on Marriage Settlements*, p. 58,) says, " that his lordship expresses " himself very cautiously ; and I must confess I think his " opinion is not well founded." The case is also reported in 1 *Anstruther*, 11, and more fully upon the question of unfairness and suspicion in the bargain ; upon which ground the bill was dismissed. It is added that the Chief Baron said, " he would not determine the case upon the " other ground without further consideration."

It may be said with great confidence, that the suggestion of the learned Chief Baron is utterly without foundation. Admit that the subject of an agreement is vendible in the view of this court, whether as an interest supposed to belong to the party, though in fact not in him, or as a right which it is known can only arise in future—and it is impossible that any distinction can be raised in favor of the heir between such a case, and the ordinary one of an ancestor agreeing to sell, receiving the money and dying be-

fore conveyance. (*Roy* v. *Barker*, 2 *Rep. in Ch.* 218.)
Strange would it be, that if there had been a warranty it
would have bound the heir by estoppel, and yet although
the agreement was fair, it would not bind the heir in this
court.

To these authorities may be added the decided expres-
sions of Lord Thurlow in *Derry* v. *Phillips*, (1 *Ves. jr.*
259,) and of the present Chancellor, in *Lawrence* v. *Bayard*,
(7 *Paige*, 761,) Mr. Maddocks, (vol. i. p. 359, *n.*) notices
that the doctrine of the civil law forbade an alienation of
an inheritance. He quotes, however, the Scotch law to
the contrary. It is permitted by the laws of Spain, of
Louisiana, and of Holland. (*Johnston's Inst.* p. 280, 289.
*Code of Louis.*, Art. 2424, 2425, ed. 1838, p. 378. *Van
Der Linden's Inst.* p. 227.)

In *Clayton* v. *The Duke of New-Castle*, (2 *Ch. Ca.*
112,) the Earl of New-Castle was the owner in fee of a
manor called Clifston. He settled it in trustees for him-
self for life, and after his death to raise portions and pay
debts, and went during the wars beyond sea. Lord Mans-
field, his heir apparent, and the present duke, eldest son
of Lord Mansfield, sold the property for a full consideration
to Wakefield, in trust for Clayton, and a conveyance was
made by them. It was settled by Clayton, partly in jointure
for his wife, and possession was held until the earl's re-
turn to England, who entered into possession. He, as well
as Clayton, died, and the bill was now by the jointress
against the present duke, to be relieved. He was held
bound to make good the sale, and to convey. The vendors
had received the purchase money, and employed it for the
benefit of the family.

In *Wiseman* v. *Roper*, (1 *Rep. in Ch.* 158,) the de-
fendant, Roper, covenanted with the plaintiff's father, upon
a marriage lately had between his daughter and the plain-
tiff, that he would, within one month after the death of his
brother, Sir Anthony Roper, convey to the plaintiff and
wife a certain manor, which was then of the inheritance
of Sir Anthony. That if Sir Anthony should alienate
it, so that it should not descend to him, then that he would

assure other lands of that value; and if no lands of that value descended, then to secure £4,000. Sir Anthony died, and the manor descended to the defendant, though charged with great debts. The bill was to compel the performance of the articles. It was insisted that it was a covenant by one not in possession, and not having any estate at the time, to settle lands. It was nothing but a bare possibility of descent in case Sir Anthony did not alienate. The court looked upon it as a matter of great weight and consequence, directed precedents to be produced, and took time to advise, and then decreed the defendant to perform the articles, and to convey accordingly. In *Whitfield* v. *Fausset,* (1 *Vesey, sen.,*) an estate was limited to the use of a husband for life, and upon his decease, if his wife should survive and have issue of her body then living, that she should take and enjoy a rent charge of £20 per annum; and from and after the decease of them both, the heirs of the body of them, and their heirs to take one annuity of £20 per annum. There were two sons, and the land was gavel-kind. In the lifetime of their father and mother, they sold the rent charge to the plaintiff, and conveyed it by deed without fine. The bill was to recover the arrears, and for a decree for growing payments, insisting that though the sons had nothing in them which they could convey at law, as an heir apparent cannot in the life of his father, yet a court of equity will support such conveyance by way of assignment or agreement.

Lord Hardwicke inclined to think that there were two distinct rents created, (p. 391,) and he says, " The plaintiff " claims as a purchaser for valuable consideration. It " was a kind of double possibility. The rent charge " might never arise at all ; or if it did, the two sons at the " death of the mother, might not be heirs of the body to " take it. If they had died in the life of the mother without " issue, the rent had been gone; if they had left issue, other " persons would have been entitled to take it by purchase. " Nothing passed, therefore, by that conveyance in point of " law ; it being by deed and no fine, which might have

" operated as an estoppel. It is true in a court of equity
" a chose in action may be assigned, and a possibility
" which has been granted for valuable consideration, and
" many transactions have been established in equity which
" could not at law. The consequence is, that as against the
" *Chaffinches*, (the two sons) the plaintiff has an equitable
" right, and is entitled to have the benefit of it decreed."

In *Ausprat* v. *Gordon*, (1 *Anstr.* 34,) it was decided,
that where there was a devise in trust to divide the pro-
perty among children as they should most deserve, a sale
of one part before any distribution was valid.

In *Shelps* v. *Hareford*, (2 *Barn. & Alderson*, 242,) it
was held, that even at law a fine by husband and wife of
lands of which her father was then seized in fee was valid
to the uses of the fine.

The case of *Hurwood* v. *Tooke & Burdet*, before
noticed as quoted by Mr. Maddocks, is stated 2 *Simon's
Rep.* 192, and furnishes a remarkable instance of the false
impression arising from an imperfect note of a case. The
eventual decision supports the doctrine of the alienability
of an expectancy rather than condemns it. But in fact it
is not a very pointed case, for two reasons : first, because
it was an agreement by two having expectations to divide
equally what should be left : and next, after the death of the
party, the sum of £4000 was accepted in satisfaction of the
claim, and a promissory note given for that sum which was
endorsed to Sir Francis Burdett. The latter fact alone was
sufficient for the decision of the case. (1 *Story' s Eq.* 338.)

In *Wethered* v. *Wethered*, (2 *Simon's Rep.* 189,) the
Vice-Chancellor, cited *Harwood* v. *Tooke*, and observed
that the doctrine in *Beckley* v. *Newland*, was so far
from being overruled by that decision, that he was bound
to consider it was upheld by it. The agreement in
*Wethered* v. *Wethered*, was by two sons to divide equally
what should come to them from their father. It was deem-
ed valid. But the reasoning of the vice-chancellor goes
very far to support an alienation to a stranger of an ex-
pectancy, as well as an agreement betwen two expectants
to divide equally. He says : " It is clear that if a testator

1840.

Varick
v.
Edwards and
others.

" meant that his devisee should have the personal enjoyment
" of his bounty, he might so devise as to stint the enjoyment
" of the devisee and restrain him from aliening the subject
" of his gift; but that if the testator did not so devise, it
" must be intended that he meant that his devisee should
" not be so stinted, but should have the full enjoyment of
" the property; and that it should be liable to all his antece-
" dent debts and all his antecedent contracts ; and there-
" fore, where there was a general devise, it gave the devisee
" the property liable to be encumbered in any way that
" the devisee might think proper, either before or after he
" took it." And Sir John Leach, in *Shelly* v: *Nash*, (3
*Mad. Rep.* 232,) holds that the principle and the policy
of the rule as to setting aside sales of expectancy and
reversions mny both be questionable.

The elementary writers, without exception, uphold the
principle of the assignability in equity of any possibility:
The rule is well expressed by Mr. Cornish, (*on Remain-
ders*, 232.) " It is observable that though at law a possi-
" bility (that is any contingent or executory interest) is
" not assignable, yet it is so in equity for a valuable con-
" sideration. If once; therefore, a contingent remainder or
" rather executory interest is derived from an equitable
" ownership, it is as entirely and completely transferable
" as a portion of the trust which answers to a legal estate:
" But when such executory limitations confer a legal
" right, of course a conveyance recognized only in equity
" can have no other effect than to convert the executory
" limitee into a trustee for the vendee, when the event
" happens upon which the interests of the former vests."

After this review of the doctrines and authorities of the
court, I apprehend that the decision in *Wright* v. *Wright*,
so much criticised, must appear the natural result of esta-
blished principles, rather than the strained adoption of a
novel rule. That case was as follows : (1 *Vesey, sen.*, 408.)
Wright devised an estate in *Dunham* to his two daughters
and their heirs and assigns, but if either of them should
marry without consent of his executors, the daughter so
marrying should only have an estate for life, and then, or

if either of them should die unmarried, his son Robert *and* his heirs should take it to him and his heirs paying $500 to the other sister. (The words *and* italicised was *or* in the will, but was construed *and*.) Robert in the life of both his sisters made a conveyance to his son George of that and all other lands whereof he had any estate in law, or equity, or in which he had any right or claim under the will of his father in *Dunham.* Robert died and after him one of the daughters died unmarried. · The bill was brought by the eldest son and heir at law of Robert, to have the estate on payment of $500 to the other daughter, who had married with consent.

Lord Hardwicke, after commenting upon the interest or right taken by Robert, says, " but that is still in notion " of law a possibility, which, although the law will not " permit to be granted or devised, still it may be released. " But this is said to be a contingent interest or possibility " of an inheritance, and that there is no case of making " that good ; as to which there is no difference, in the " reason of the thing between that, and the allowing of an - " assignment of a possibility of a ·personal thing or chattel real." After adverting to Trevers' case (*Hobsen* v. *Trevers,* cited *ante,*) he says, " in that case it was made good by " way of agreement for valuable consideration ; then how " does an assignment differ from it ; an assignment always " operates by way of agreement or contract, amounting in " the consideration of this court to this, that one agrees ." with another to transfer and make good that right or " interest, which is made good here by way of agreement."

·The case of *Boynton* v. *Hubbard,* (7 *Mass. Reports,* 112,) is deserving of much attention. A great principle was asserted with all the power of one of the most vigorous legal intellects of our country. The case was this. The defendant had executed a deed to the plaintiff in which he covenanted, in consideration of $450 paid to him, and for other good considerations, that he would pay over, or cause to be conveyed to the defendant, his heirs, &c., one third part of the lands and goods that then had or should descend to him as heir to T. H. and E. P., as soon as he

could obtain possession of the same. After the death of

T. H. and E. P., the defendant got possession of a large estate from them, and upon an action of covenant the jury assessed the damages of the plaintiff at $2,000. The judgment was arrested and the defendant had his costs.

Chief Justice Parsons, after portraying the evil effect upon the morals of heirs of permitting such transactions, says : " It is therefore our opinion, that this contract by an " heir to convey on the death of his ancestor, living the " heir, a certain undivided part of what shall come to the " heir by descent, distribution or devise, is a fraud on the " ancestor productive of public mischief, and void as well " at law as in equity."

Justice Story sums up the doctrine of this case thus : " A case of a very similar character, is a contract by which " an expectant heir, upon the present receipt of a sum of " money, promises to pay over to the lender a large, though " an uncertain proportion of the property which might de- " scend to him upon the death of his parent or other an- " cestor, if he should survive him." (1 *Story's Eq.*)

With the greatest respect for a name so illustrious as that of Parsons, it is impossible to say that the sale of an expectancy, or of an aliquot part of an expectancy, is void in equity. On the contrary, the weight of authority is decidedly the other way. I have stated several cases clearly in point, and have found nothing in contradiction, but the vague note of Mr. Maddocks, as to Lord Eldon's disapprobation in *Harwood v. Tooke ;* and I find Lord Eldon, within a year afterwards, expressing a different opinion. There is no decision from him. Be therefore the rule wise or pernicious, I am bound to say it is the existing law of the court.

In many instances, the property which will be taken as heir, is nearly ascertained ; and certainly there is a class of cases in which the value of the expectancy of an heir is as capable of determination, as the value of a contingent future estate. Yet our legislature has expressly sanctioned the alienability of contingent estates. (1 *R. S.* 723, § 13, 725, § 35.) The uncertainty of getting any thing where

the contingency is the happening of a future event, is equal. There will, in general, be a difference, yet not always, as to the amount of the property which will come upon the event occurring.

Again, let the doctrine of the court upon a *post obit* bond be examined. Such an obligation is not void at law, but it will be relieved against in equity, unless it is proven to be fair and reasonable. I put it in this form, according to the doctrine of the later cases, imposing the burden upon the holder of showing that a fair price was given; not upon the obligor, to show that the price was unreasonable. (See *Shelly* v. *Nash*, 3 *Mad. Rep.* 232.) But under this limitation the bond is supported.

Now a *post obit* obligation is an agreement on the receipt of money by the obligor, to pay a sum exceeding legal interest upon the death of a person from whom property is expected. Compare then the case of such a bond with a covenant to convey one half of an expected estate, in consideration of a certain sum. The one is capable of a present valuation with reasonable certainty. The other is to convey a proportion of what shall be received, not of what is anticipated; and when the event happens, the share is capable of accurate liquidation and comparison with the price paid. Then what does this court do? If the comparison shows that the price was reasonable, it enforces the contract; if otherwise, refuses its aid: and if the heir comes for and is entitled to relief, compels him to repay the advance.

It is true the great objection arising from the deceit upon the ancestor, and the encouragement to prodigality in the heir, remains. But that objection applies, when judged of in this court, with equal force to a *post obit*, as to a sale of a certain portion of expected property. The one is to pay an aliquot part, and the other to convey a proportionate part; yet a court of equity sustains the former, if reasonable. Nay, the learned and able chief justice says, that a court of law will give relief, by directing payment of the principal advanced, and interest. Is then the court of chancery to abandon its doctrine of supporting

the bond for a specific sum, or is it to draw a distinction, which appears to me wholly unsubstantial? I can well imagine that a court of law, being bound to pronounce the instrument wholly void, or absolutely good, without regard to the amount of the consideration or other circumstances, may upon principles of public policy declare the former. But I find too much express authority, and too much powerful analogy, to permit me to declare that the sale of an expectation of an heir is in itself void, and incapable of enforcement in this court.

But the present case does not fall within one of the principles, nor is effected by one of the arguments brought to bear by Chief Justice Parsons upon the questions before him; and an exhibition of its points of difference will lead us more highly to appreciate the maxim of the great Pascal, that *truth consists in distinction.*

A *post obit* bond it is admitted is not absolutely void, because the contract may be made on data whence its reasonableness may be ascertained. The lives are capable of being valued. The estate of a remainder man or reversioner may be sold, because a reasonable and sufficient consideration may be paid as ascertained by the annual value of the estate and of the intervening life. The sale by an expectant heir of an uncertain right wants these qualities. But above all, it encourages a dangerous independence of a parent's control, fosters prodigality and vice, and deludes the ancestor into the gift of his property to the panders of his descendant's extravagance. These are the strong arguments with which such a transaction is assailed. But in this case, if my conclusion is right that the mortgage was the basis of the title, and all title passed with it in this court, there is an end of any difficulty. The executors of the estate transferred the mortgage. The whole question is whether the value paid to the estate for the whole right was adequate. There is no room for the objection of an uncertain valuation of an indeterminate or contingent interest.

But again, supposing this supposition inadmissible in consequence of the decision of the court of errors, still

the whole estate, except Medcef's expectancy or possibility of taking the fee, passed at law. Add that possibility and the whole passed. Now if I should conclude that it was intended that Medcef's possibility should pass, then the question is merely as to what was a proper consideration for the combined interests. Nothing is to be ascertained but whether the rights of all were adequately paid for; whether, if Medcef had then held the whole, (Joseph being dead,) it was a reasonable sum to pay. Whether the price actually paid was reasonable or not is the subject of future examination; but most clearly the ascertainment of an adequate price, for every right that either of them on any supposition could have, is practicable—is not difficult. Nothing but the ordinary uncertainty of fixing value where a title is not perfect rests upon the subject. How, as the matter stood, the sum was to be apportioned among them, is a point with which the purchaser had nothing to do. Did he pay enough for all which both possessed, or either could possess ?

And the case is also entirely free from the great objections resulting from public policy and private morals pressed by the chief justice.

Again, Senator Tracy points out a difference (13 *Wendell*, p. 214,) between this expectation of an heir and " that under a devise which is independent of the will of " another, and depends only upon the happening of a con- " tingency which providence alone controls." It is too plain to need argument, that in this instance there was a right in Medcef far beyond the bare expectancy of an heir. The learned senator, at page 213, distinctly admits it. It was certain that the estate would vest in him upon the happening of two contingencies, viz. his own survivorship and the death of Joseph issueless. The chancellor, in his clear opinion, considered this as rendering it an executory interest in an ascertained person, and hence transferable at common law ; but it was decided otherwise—and then it presents a strong case of a contingent interest in the contemplation of a court of equity.

There has been a point adverted to in the arguments

and opinions which requires a slight notice. It is whether the assignment could operate at all, Medcef not being in possession. Senator Tracy gives one answer to this which he would have held sufficient had there been an interest capable of being released. But another appears to me decisive. If the contingent interest is assignable here strictly speaking, then the possession of Joseph might be regarded as the possession of Medcef for this purpose, exactly as the possession of tenant for life is that of a remainder man to support the grant of the latter. But in fact it operates as an agreement to convey when the estate and right of possession vests ; and the question of possession has nothing to do with the case.

I conclude that this court had jurisdiction in the year 1814 to have compelled the conveyance of the interest of Medcef Eden acquired on the death of his brother, to the purchasers under Winter ; *provided* there was an intention to transfer it when the assignment was executed in 1804, and that the consideration was valuable and fair ; and the parties seeking the conveyance were unaffected with any taint of fraud.

1st. Here the first question is as to the intention. Upon this point Senator Tracy says : " that the instrument " shows that the Edens intended to release and convey all " their interest in the premises, without stipulating what " that interest was; and that Winter intended to get it all, " without caring in what form it came." *Again.* " It is " not disputed that the deed to Winter conveys all the " present estate, right and interest which Medcef then had, " and which was conveyable ; nor is it, on the other hand, " contended, that it in terms purports to convey any future " estate, right or interest, which Medcef might have."

The Chancellor, (p. 188,) says : " The legal presumption " is, that they, Joseph and Medcef, joined in the assign- " ment of the land itself, for the purpose of transferring their " legal interest in the pledge ; which legal interest had " passed to them as devisees, either by the general or spe- " cial bequests contained in the will."

Much argument has been used to show that it was not

*margin:* 1840 Varick v. Edwards and others.

meant by Medcef to pass the contingent interest he had under the will. The assignment is in the name of the two sons and of the widow, as executors and executrix, and is signed by the two as executors. But when commenting upon the clause transferring to " Winter, his heirs and as- " signs, all their right, title and interest, in and to the lot " of ground and premises before mentioned, and every part " thereof," counsel were pressed so far as to admit, or rather not deny, that the present right of Joseph in the es- tate did pass. And unquestionably this was the case. But if the words meant something as to Joseph, and passed his vested present right, they must mean something as to Medcef, or they are utterly inoperative. They then mean, that he intended to pass his possible future right, or they mean nothing.

Again, if the views before suggested are sound, that the right to the fee had become attached to the owner of the mortgage, by reason of holding the mortgage, then neces- sarily the transfer of the mortgage transferred the land. The assignment of the bond or the debt, carries the mort- gage with it. The transfer of the land without the bond or debt carries no interest in the property whatever. ( *Wilson* v. *Troup*, 2 *Cowen*, 195.) This is not questioned to have been the result even at law, as far as Joseph was concerned. But when Medcef succeeds upon Joseph's death, this court finds him in the situation of having as- signed the bond and debt and the mortgage. Necessarily it must hold, that he meant to assign any thing which could accrue to him by virtue of the mortgage; and if the law will not ratify the transfer as perfect, this court must convert him into a trustee.

The case of *Pope* v. *Whitcomb*, (3 *Russell's Rep.* 124,) was referred to by counsel. There was a bequest of the residue of personal property among a class of persons, who, it was held, did not take vested interests, but that the whole went to the survivors of them. One of these sur- vivors had, before the event occurred on which the shares vested, assigned " all and singular the household furniture, " plate, linen, china, stock in trade, and all other the estate

" and effects whatsoever of or to which she was then pos-
" sessed or entitled," upon certain trusts.

It was held, that the share in the residue bequeathed did not pass either under the particular or the general words contained in the instrument.

The case then is only one of that class in which the enumeration of the specific objects of an assignment limits general words to similar objects. It differs from the present in this; that here the particular words, without the general, would be sufficient to pass the interest in this court ; _a fortiori_ it must be where comprehensive general words are used.

2d. With respect to the sufficiency of the consideration, it has been pressed, that in September, 1804, the sum of $500 only was paid for this property by Winter, and that in May, 1805, Mr. Boyd gave for it $2,660.

In 1803, the title under the mortgage had become perfected by the twenty years possession. By force of the statute of 1788, (_Laws_, 11th sess. ch. 200,) and that of the 8th of April, 1801, § 8, ( _Webst._ ed. 1, 165,) it could not commence adversely until the 21st of March, 1783, nor expire till the 21st of March, 1803, even supposing there was a possession in 1782. I think it must be assumed to have begun on the 25th of November, 1783, the day of the evacuation.

On the 17th of July, 1804, Winter had received a deed from Ware Branson, who claimed the property under Bridgwater and wife. It must be noticed that the conveyance from Fine in 1767, was to Bridgwater _and his wife Mary._

Branson it appears was the son of Mrs. Bridgwater, and claimed the premises as heir at law. Tylee says he has heard him speak of his claim. If Mrs. Bridgwater survived her husband, the title of course vested exclusively in her, and the right to redeem only commenced when she became discovert. The analogous bar of this court only operated from that time. The claim of Branson, even supposing there was no recognition of the mortgage by payment, does not appear so shadowy as has been usually

supposed. When his mother went away in November, 1783, she was under disability. If she lived abroad until after March, 1795, and then died, her husband being dead, her heir Branson had until March, 1805, to redeem. He had ten years from the cessation of her disability. I presume he had no more, although the English statute of the 1 *James* I. cap. 16, was in force in this state until the act of 1788, and in that statute there is the exception of the being beyond seas, which was omitted in our own act.(*a*)

The actual possession commenced, either upon the deposite of the deeds in April, 1782, or on the 25th of November, 1783, the day of evacuation, or on the 25th of December, 1783, the day of the assignment. Now if the former was the case, no possession could commence to run adverse to the wife, for the plain reason that had it been an actual conveyance by Bridgwater alone, it would not have begun. The statute of limitations would only commence upon the husband's death. (*Cullen* v. *Meteor*, 13 *Serg. & Rawle*, 356. *Anon.* 2 *Atk.* 333.)

And upon either of the other suppositions there is a point which might deserve much consideration ; and that is, whether Branson had not twenty-five years to redeem from the 21st of March, 1783, at the earliest. If his mother survived, he could have brought, I presume, a writ of right upon her seisin, under that peculiar estate which the law creates upon a conveyance to husband and wife. (4 *Kent's Com.* 362.) He would have counted as her heir. (*Williams* v. *Woodard*, 7 *Wendell*, 250. See *Blanchard on Limitations*, p. 40, *Law Library*, vol. i.) And I think that a very strong argument may be made to show that the analogy of the statute of limitations ought to extend to such a case. I am aware that the learned editor of *Powell on Mortgages*, intimates a different opinion ; and what is of far greater authority, that Lord Redesdale has sanctioned that opinion. (2 *Jac. & Walker*, 192.)

---

(*a*) I believe there was no colonial act of limitations except a partial statute passed in 1710.

<div style="margin-left:0">Varick<br>v.<br>Edwards and others.</div>

1840.

Varick
v.
Edwards and
others.

The great case in which this was expressed (*Cholmondely* v. *Clinton,*) is not a decision upon the subject. It was not a case of an heir, but of a devisee. And it was throughout argued that as devisee, Mrs. Damer could not bring a writ of right, but only ejectment ; that she was barred at law by twenty years possession, and must be equally so in equity. (See 2 *Mer.* 274.) In this view also, if Bridgwater survived, so that Branson was not his heir, his true heirs would have had the same right.

Again, it appears in the evidence now adduced, that an action of ejectment was commenced on the 17th July, 1804, to recover the premises at the suit of Ware Branson ; that on the 6th day of August, judgment was had for want of a plea, and a writ of possession was sealed on the 11th December.

Reynolds says that he and his brother lived on the premises ; that in 1803 the Scotch Presbyterian Church claimed the property. That in 1802 he saw his brother pay rent to James Smith, a trustee of the church ; that Branson, the Church and Winter, drove him out of the house. It appears from the evidence of James Morris, that as sheriff he sold the premises under an execution against one of the Edens, to James R. Smith, and executed a deed. He understood that Smith purchased for the Scotch Presbyterian Church. He did not get the purchase money. From the evidence of Charles Wilkes, it appears that the sale was not consummated. He held the deed, having got it from Morris the sheriff and the Bank of New-York was interested in the judgment.

The abandonment of claim by a judgment creditor, who had sold in 1801 under his judgment is, to my mind, a strong circumstance. I do not see what impeded the assertion of it, unless it was the strength of Branson's title. The deed of the sheriff was dated May 13th, 1801. The assignment to Wood was not made till the 20th of August, 1801. It does not appear whether the judgment was against Joseph or Medcef ; but the probability is, that it was the former. If so, and there was only a mortgage

to redeem, which certainly was then redeemable, nothing but Branson's title seems a decisive bar.

I have brought together these various circumstances, not as deciding rights, but as leading inevitably to an inference that the state of claims at that period was such, that we cannot pronounce the consideration of the assignment inadequate, even assuming that every right and interest of every description was meant to pass by it. On the contrary I deem it ample.

3d. The fairness of the transaction is next called in question. This depends entirely upon the presumed conspiracy to defraud Wood the assignee, and the creditors of the Edens, entitled under the assignment.

The Chancellor has given a very strong answer to this objection. At page 188, 13 *Wendell*, he says: "Even if "the transaction was concocted in fraud for the purpose of " defrauding the assignee of Joseph Eden, yet as no such "intention appears on the face of the instrument, Boyd, " who was a *bona fide* purchaser for a full consideration, " and without notice, although he might not have been " protected against the claim of Wood, is certainly entitled " to protection against the claims of all the parties to the "assignment, and all others who claim under them."

It appears in the present case that Medcef had also made an assignment to Wood. But the observations of the chancellor equally apply, and I do not understand that the filing of a discharge or an assignment is constructive notice to all the world.

Again, the case of *Carleton* v.———— before cited, gives great countenance to the opinion that although the interest of Medcef was capable of being the subject of a contract enforceable in this court, it was not such an interest as passed under the insolvent law.

I come to the conclusion, that in the year 1814, a bill would have been sustained in this court to compel Medcef Eden to perfect the title to this property; which title was imperfect at law, and which defect he was bound in conscience to remove.

II. The second branch of the case was to consider

whether any circumstances now exist, which preclude the court from entertaining such a bill.

1840.

Varick
v.
Edwards and others.

1st. And first it must be examined, whether redress in this court is not shut out by the submission of the plaintiffs of their claims to the courts of common law, and the final decision there made. This is, in my opinion, a very grave question, and the only one of serious difficulty in the cause. The conclusion to which I have arrived is, that the parties are not precluded ; and upon the ground, that after a total failure at law from the want of jurisdiction there and exclusive jurisdiction here, this court is still open, unless the statute of limitations has intervened. A full examination of the cases is important.

In *Morse* v. *Faulkener*, reported from Lord Colchester's MSS. (3 *Swanston*, 429 n,) the party had failed at law, after carrying the case to the King's Bench, (see 3 *T. R.* 365,) and then filed his bill. No question was made of his right to do this, though it was dismissed on the merits. This case has been before noticed for another point.

So, in *Theobald* v. *Duffy*, (9 *Mod.* 101,) before cited, there had been an express decision at law against the party, before he filed his bill.

In *Brophy* v. *Holmes*, (2 *Molloy*, 9,) it seems to be considered that a mistake in the jurisdiction, though it would not prevent the statute of limitations from running, yet would not prejudice a new proceeding in the proper tribunal.

A great number of cases proceed upon the distinction where the subject matter is within the peculiar jurisdiction of a court of law, or there is a concurrent jurisdiction, or an exclusive jurisdiction in equity.

For example, in Virginia there are several decisions. *Terel* v. *Dick*, (1 *Call's Rep.* 546,) is one of the earliest, and has been uniformly followed. The decision, in the language of Judge Roane was, " that no case had " taken place of the interference of a court of equity in a " question purely legal, and where the case was precisely " the same as that decided on by the court of law, on the " ground that that decision was erroneous." In *Meredith*

v. *Johns,* (1 *Hen. & Munf.* 585,) Judge Tucker observed, " I think this court ought not to suffer a case, decided " upon such full and solemn argument and consideration, " to be again discussed upon the same controverted points ; " since it would only encourage that endless spirit of liti- " gation which has kept this controversy on foot for four " and twenty years ; and if indulged, would perpetuate it."

So, in *Bateman* v. *Willoe,* (1 *Sch. & Lefroy,* 204,) Lord Redesdale, after enumerating certain exceptions, such as cases of complicated accounts where the party has not made defence, because it was impossible for him to do it effectually at law, or where a verdict has been obtained by fraud, &c., observes : " But without circumstances of " that kind, I do not know that equity ever does interfere " to grant a trial of a matter which has already been dis- " cussed in a court of law, a matter capable of being dis- " cussed there, and over which the court of law had full " jurisdiction."

The following are cases in which there was a con- current jurisdiction ; and the party having resorted to a court of law, and fully tried his case there and failed, was refused relief here. (*Kieth* v. *Humphries,* 1 *A. K. Mar- shall,* 13. *Danes* v. *Richardson, ibid.* 312. *Morris* v. *Ross,* 2 *Hen. & Munf.* 412. *Manning's Ex.* v. *Hart,* 2 *Bibb's Rep.* 4.)

Thus, in *Manning's Ex.* v. *Hart,* (2 *Bibb's Rep.* 4,) it is laid down, that if the defence is purely legal, and the defendant neglect to avail himself of it at law, equity will not relieve. But if the case is one of concurrent juris- diction, and the party fails to defend himself at law, he may be relieved in equity, unless he has made a defence at law and failed, in which case equity will not review the proceedings.

In *Stothart* v. *Burnet,* (*Cook's Ten. Rep.* 408,) relief was given after a trial at law, in a case of complicated accounts, where the parties came to hearing upon bill, answer, &c.

These decisions leave the question untouched in cases in which this court has exclusive jurisdiction of the sub-

ject matter, and the failure at law has arisen from the want of jurisdiction.

But in *Appleton* v. *Harwell*, (*Cook's Ten. Rep.* 242,) it is held, that if the nature of the defence is merely equitable, this court will relieve, though there has been a full trial at law. The court say, "it will be remembered that " this court is the only tribunal in which this fraud could " legally be investigated. Against the bill obligatory on " which the action at law was founded, it ought not to " have been received in evidence, and the illegality of the " proceeding at law in admitting that evidence can make " no alteration in the principles upon which the jurisdic- " tion of this court is founded." Again—" although the " court of law took cognizance of it, this court is not " thereby precluded from examining the same subject " where it is clearly perceived that justice has not been " done in a case where the matter of defence is of an " equitable nature, and which in a court of law proved " unavailing."

In *Burchet* v. *Faulkner*, (1 *Dana's Rep.* 100,) a bill was filed to enjoin a judgment on one of the instalments of an agreement, and to rescind the contract. The plaintiffs in error had pleaded a failure of consideration and fraud, and mistake, and issues on these pleas were tried. The bill was dismissed by the circuit court, and on appeal, the court said—the circuit court seemed to consider that defence at law a bar to a rescission of the contract. But in that view the judge was mistaken. It is evident that the grounds now presented for rescission could not have been available at law.

In *Blue* v. *Patterson*, (1 *Dev. & Battle's Eq. Ca.* 458,) the right to a slave was in question. Per *Daniel*, Judge. " *Second objection*. The plaintiff brought a suit at law " for the slave, and there was a verdict and judgment for " the defendant. *Answer*. The defendant held the slave as " administrator of J. P. in trust for the plaintiff; and a " court of law has no jurisdiction of trusts. The plaintiff's " remedy was only in a court of equity. The judgment at " law is no bar here, as the court of law had no jurisdiction

1840.

Varick
v.
Edwards and
others.

"of the subject matter." Objection overruled. (See also *Alley* v. *Ledbetter*, 1 *Dev. Eq. Ca.* 449. *Couchman's Heirs* v. *Slaughter*, 1 *A. R. Marshall*, 388.)

If then the present was not a case for relief at law, its rejection there is not to prejudice its admission into equity. It is determined that it was not a case for recovery there. It undeniably in my judgment was a case for relief here. It has not been pronounced by the overruling tribunal that relief shall not be had here.

And I think the settlement of this point goes far towards the decision of another at which I before glanced, viz. that no matter of fact found or declared to be proven in the proceedings at law, is to be deemed unquestionably established in the new proceedings in equity. It must be within the power of this court to judge upon the same evidence, or receive and illustrate the case by new. We are thus brought back to the point what case does the testimony now before me raise, and was that case one of purely and exclusive equitable jurisdiction.

It is very true that the variant conclusion of this court must not present so different a case as to render it one of concurrent jurisdiction, or remove the ground of the decision at law. But I may conclude differently upon the evidence in points where my conclusion tends to aid the equity here without displacing the ground taken at law. And clearly fresh evidence may be adduced to any collateral matter tending to sustain the claim in this court. Hence I consider myself at liberty to treat the fact as proven, that the title and possession of the elder Eden began as mortgagee and so continued to his death; because, while the court of errors came to a different result upon the evidence before it, that result was not essential to their decision. On the contrary the decision was made even supposing the fact to have been as I find it.

The summary of my views upon this important part of the case is, that the failure at law took place because the instrument could not operate as an effectual transfer there, and because the court of law had no jurisdiction to carry it into effect as an agreement. That it can be enforced by

a court of equity, and that this court has exclusively the power to enforce it. Hence that there is no bar in the judgment of law against the present suit.

2d. An objection has been urged with great force by the counsel for the defendant, arising from the length of time which has elapsed since the right to file a bill accrued.

In 1813 the right arose by the death of Joseph Eden without leaving issue. At that time, Varick, claiming under Winter, was in possession of the premises, and so continued until 1829. He was then dispossessed in consequence of the decision in the case of *Jackson* v. *Varick*, (2 *Wendell*, 200.) In 1828 an action of ejectment was commenced against Rachel Eden by Varick, which was finally decided in the court of errors in December, 1834, and on the 10th of April, 1835, the present bill was filed.

It is the settled general rule that the lapse of twenty years operates as a limitation and bar to a suit in equity connected with the recovery of land. (*Cholmondely* v. *Clinton*, 2 *Jacob & Walk.* 192. *Hawley* v. *Cramer*, 4 *Cowen*, 718. *Elmendorf* v. *Taylor*, 10 *Wheaton*, 176.)

It is equally true, that where a party has resorted to an action at law, when his remedy was in this court, or to this court when his remedy was at law, he cannot be protected against the time lost by the wrong proceeding. (*Anon. 2 Atkyns*, 1. *Brophy* v. *Holmes*, 2 *Molloy*, 9. *Gray's Adm.* v. *Keryman*, 4 *Munf.* 181.)

But I consider that the objection does not apply during the time that Winter and the purchasers under him were in possession, viz: from 1813 to 1828. If time is set up as a conclusive bar by analogy to the statute, the court only treats it as such when there is an adverse possession. (*Elmendorf* v. *Taylor*, 10 *Wheaton*, 176. *Mims* v. *Mims*, 3 J. J. *Marshall*, 106. *Barbour* v. *Whitlock*, 4 *Monroe*, 197.)

In the last case the Chief Justice says : "What statute " of limitation at law, or rule of limitation in equity, ever " ran against the possessor, and in favor of him against " whom the possession has been holden ?"

Again, the decision of Lord Redesdale, in *Bond* v. *Hopkins*, (1 *Sch. & Lefroy*, 413,) is closely applicable to the

VOL. I.                     53

present case. "A party obtaining wrongful possession, "and setting up a false title under color of instruments "finally condemned, during the investigation of which he "is protected in the possession, shall not avail himself of "any length of possession pending the investigation, as a "bar to the person who ultimately proves to have the "right."

The present defendant Edwards, admits in his answer, that at the time of his purchase in October, 1834, he had full notice of the claim of S. Boyd to the premises, but says he was informed by counsel, that he had a good right to make the purchase. There is no ground whatever to treat him as a purchaser without notice, by virtue of his previous arrangements with Burr and Peletreau. I cannot perceive on what ground Waldron and wife were made parties. The complainant knew of their having absolutely conveyed when they filed their bill. As to the suggestion that they were made parties with a view to recover the rents and profits against them, it would not suffice, even if the claim to such rents was valid. But there is no view in which such a claim can be supported, except from the time of the filing of the bill. The complainants chose the wrong tribunal, and can have the profits only from the time of their demand made in the proper one.

The bill must be dismissed as to Waldron and wife with costs.

There must be a decree declaratory of the right of the complainants under the instrument of 1804, and their rights to have the same enforced against the present defendant, O. E. Edwards.

Decreeing a reference to a master to state an account of the rents and profits of the premises from the time of filing the bill, making to the said defendant all just allowances for taxes, repairs, assessments, and other proper outgoings.

That upon the coming in and confirmation of the report the defendant pay such amount, and the complainants have execution thereof. That such defendant execute and deliver to the complainants, or to such persons as they shall designate, a good and sufficient deed of con-

veyance of the premises in question, to be approved of by the master in case the parties differ, and to be executed in ten days after the same shall have been so approved and proffered for execution. That the parties be let into possession of the said premises, and that all deeds, &c., in the power of such defendant respecting such premises be delivered up.